NATIONWIDE MUTUAL INSURANCE COMPANY v. RONNIE WAYNE LAND, JESSIE H. PRUITT, ARCHIE ROLAND TALLEY, NORTH CAROLINA NATIONAL BANK AND LUMBERMENS MUTUAL CASUALTY COMPANY

No. 58PA86

(Filed 18 November 1986)

**1. Insurance § 82— no coverage by lessor's insurer**

In an action in which a lessor's insurer sought a declaratory judgment to determine whether a blanket insurance policy issued to the lessor, NCNB, provided coverage for injuries received by third parties in an automobile collision involving a leased car, the facts did not support the conclusion that the driver was NCNB's lessee at the time of the collision and the insurance policy did not provide coverage under N.C.G.S. § 20-279.21(b)(2) because the actions of NCNB clearly manifested its termination and rejection of the lease; the failure to locate and repossess the automobile did not alter the fact that the lessor-lessee relationship had been terminated. A clause providing that the lessee

---

1. See the definition of "unload" in Webster's Third New International Dictionary 2503 (1961).

2. *Id.* at 339.

would not be released from any of his lease obligations in the event of termination prior to the expiration of the lease's term was nothing more than an acceleration or liquidated damages clause. N.C.G.S. § 20-281.

**2. Insurance § 87.2— leased automobile—breach of lease—no insurance coverage under omnibus clause**

 In an action in which an automobile lessor's insurer sought a declaratory judgment to determine whether its policy provided coverage under its omnibus clause to a lessee involved in an accident, the lessee's use of the automobile at the time of the collision was outside the scope of the express permission granted by the lessor, NCNB, because the lessee's use materially deviated from the express terms and conditions of the lease agreement; furthermore, there was no implied permission for use of the automobile from NCNB's allegedly insufficient efforts to recover the automobile after the lessee's default because implied permission is strongly negated by evidence that the use of the automobile was by virtue of a restricted express permission. Possession of a valid registration card by the lessee does not support implied use absent findings as to how the lessee obtained possession of the registration card.

 Justice MITCHELL dissenting.

 Justice FRYE joins in the dissenting opinion.

ON defendants' petition pursuant to N.C.G.S. § 7A-31 for discretionary review of a decision of the Court of Appeals, reported at 78 N.C. App. 342, 337 S.E. 2d 180 (1985), reversing the decision entered by *Morgan, J.*, at the 19 November 1984 Civil Session of Superior Court, ROCKINGHAM County. Heard in the Supreme Court 13 October 1986.

*Petree, Stockton & Robinson, by James H. Kelly, Jr.,* for *plaintiff-appellee.*

*Tuggle, Duggins, Meschan & Elrod, P.A., by J. Reed Johnson, Jr.,* for *defendant-appellants.*

PARKER, Justice.

Plaintiff Nationwide Mutual Insurance Company (Nationwide) seeks a declaratory judgment to determine whether a blanket automobile insurance policy issued by Nationwide to North Carolina National Bank (NCNB) provides coverage for injuries sustained by defendants Ronnie Wayne Land and Jessie H. Pruitt in an automobile collision that occurred in South Carolina on 12 April 1981. At the time of the accident, defendant Lumbermens Mutual Casualty Company provided uninsured motorists coverage for the ve-

hicle occupied by Land and Pruitt. A 1979 Chrysler Cordoba automobile owned by defendant NCNB and driven by defendant Archie Roland Talley was involved in the accident. The issue in this case is whether the Nationwide policy affords coverage for the liability incurred by Archie Roland Talley in the collision.

All parties waived a jury trial, and the trial court entered judgment declaring that Nationwide provided compulsory coverage pursuant to N.C.G.S. § 20-281 (1983)[1] and voluntary coverage pursuant to the terms of its policy, "for legal liability of Archie Roland Talley for personal injury and property damage arising out of the operation of NCNB's 1979 Chrysler automobile on April 12, 1981 . . . ." The Court of Appeals reversed, holding that Talley was neither a lessee nor an insured, and, therefore, that Nationwide's policy provided neither compulsory nor mandatory coverage.

On discretionary review in this Court, defendants advance two alternative theories for finding coverage under the Nationwide policy: (1) that § 281 requires the policy to provide coverage because of the existence of a lessor-lessee relationship between NCNB and Talley; and (2) that the policy itself provides coverage for Talley as an "insured" because he was operating the automobile with the permission of NCNB.[2] We find that the Nationwide policy provides coverage under neither of these theories and consequently affirm the Court of Appeals.

I.

The stipulations, admissions, and evidence in the record indicate that on 7 December 1979, Talley entered into a lease agreement with NCNB that provided that Talley rent the 1979 Chrysler Cordoba automobile, which would be owned by and registered to NCNB, for thirty-six months at a stated monthly rental payment. The lease required that Talley maintain liability, comprehensive, and collision insurance on the automobile during the

---

1. All statutes referred to in this opinion are in Chapter 20 of the General Statutes of North Carolina. Hence, further statutory references will be to section numbers within Chapter 20.

2. Defendants do not address in their brief the issue of whether there is statutory coverage of Talley's "lawful possession" of the automobile on 12 April 1981 under § 279.21(b)(2).

term of the lease. The lease further provided that Talley's failure to pay any rental payment when due or to maintain the insurance coverage in full force and effect would constitute "events of default." Also listed as events of default were other specified occurrences, such as when NCNB "reasonably deems itself insecure or its prospects for payment . . . impaired." Upon the occurrence of any event of default, the lease granted NCNB the right to terminate the lease without releasing Talley from any of his obligations under the lease agreement and the right to demand and receive immediate possession of the automobile.

Before closing the transaction, Mr. Watson, the NCNB loan officer who handled Talley's account, had a credit check run on Talley and called an automobile leasing company with which Talley had previously done business. Upon finding nothing derogatory, Watson proceeded to close the transaction. Talley delivered an insurance form, required by NCNB, indicating he had insurance coverage with Nationwide of the type and in the amount required by the lease. Watson verified that such a policy was in effect. Although no Nationwide policy was ever received by NCNB, NCNB subsequently received a policy meeting the lease requirements from United States Fidelity and Guaranty Company (USF&G). This policy provided coverage from 15 February 1980 to 15 May 1980. At the close of the transaction, Talley paid the first and last monthly rental payments as required by the lease. On 25 January 1980, Talley paid the January and February 1980 monthly rental payments.

In March 1980, a detective from the Winston-Salem Police Department informed Watson that a warrant had been issued in South Carolina for the arrest of Archie Roland Talley for grand theft larceny. At that time, Talley's March 1980 rental payment was past due. Upon investigation, Watson learned that he had received information from the sales department rather than the collections department of the leasing company with which Talley had dealt previously. The collections department then advised Watson that they had experienced numerous problems with Talley on previous leases. Based on the police detective's information that Talley had an address in Georgia prior to the North Carolina address that he gave to NCNB, Watson had a Georgia credit check run on Talley and discovered further derogatory credit information.

On or about 28 March 1980, Watson went with the police detective to Talley's place of employment; there he was advised by the manager that Talley had told the manager earlier in the day in a telephone call that he was quitting his job and leaving town. Watson next went to Talley's Winston-Salem address and was advised by Talley's brother that Talley had left town. Talley's brother did not know where Talley could be located, but he agreed to notify Watson if he received any information as to Talley's whereabouts. On 28 March 1980, NCNB assigned Talley's account to the Automobile Recovery Bureau in Atlanta, Georgia, with instructions to locate Talley, to repossess the automobile, and to accept no further payments.

On 2 April 1980, NCNB sent to the Winston-Salem address designated in the lease by Talley as his address a "demand letter," advising Talley that he was in default, demanding that Talley pay the unpaid "net balance," and directing Talley "to surrender to North Carolina National Bank any collateral" securing the account. During the months of April and May 1980, Watson continued in his efforts to locate Talley and the automobile, contacting persons in South Carolina, including Talley's former wife, as well as persons in Atlanta, including USF&G, Talley's insurance carrier. USF&G advised Watson that it was also seeking Talley in order to notify him that his policy was cancelled for non-payment of premiums.

In June 1980, when Talley's account with NCNB was ninety days past due, NCNB "charged off" the account and assigned it to NCNB's recovery department. On 20 August 1980, NCNB's vice president in charge of consumer credit had a warrant taken out in Forsyth County, North Carolina, for the arrest of Talley, based on the allegation that Talley had obtained possession of the automobile by fraud in violation of § 106.1. No further report was made nor was any contact made with State law enforcement agencies or the Division of Motor Vehicles.

On 12 April 1981, while driving the automobile under the influence of alcohol in Myrtle Beach, South Carolina, Talley was involved in an automobile collision resulting in serious injuries to defendants Land and Pruitt, who thereafter commenced civil actions against Talley in South Carolina based upon Talley's alleged negligence. At the time of the collision, the 1979 Chrysler automo-

bile displayed a current North Carolina license plate and inspection sticker, and Talley had in his possession a current registration card identifying NCNB as the owner of the automobile.

NCNB's file on its transaction with Talley contained the registration card expiring 15 February 1981 for the automobile; the file contained no registration card for the period in which the collision occurred. The North Carolina Division of Motor Vehicles ordinarily would mail the registration and the license plate renewal materials to the registered owner of the leased vehicle, in this case, NCNB. NCNB, in turn, customarily forwards these materials to the lessee. In those cases where a lessee's account is in default, NCNB's usual procedure is not to forward these materials to the lessee, but to hold the registration card and renewal materials in its file. NCNB's file for Talley's account also contained information, developed by NCNB's recovery department, that Talley had a parole officer in South Carolina, that Talley had a South Carolina driver's license, and that Talley had been charged with drunk driving and the automobile had been impounded, but later recovered by Talley.

Based upon its findings of fact, the trial court made the following conclusions of law, *inter alia*:

6. At the time of the accident on April 12, 1981, Archie Roland Talley was a lessee of NCNB, operating the 1979 Chrysler automobile as a member of the public subject to and within the meaning of GS § 20-181.

7. Nationwide is required by GS § 20-181 to provide insurance coverage, up to the face amount of Nationwide's policy 61-GA-640-273-0002 ($500.00 [sic] for bodily injury/$250,000 for property damage) for liability imposed by law for bodily injury or property damage arising out of the operation of the 1979 Chrysler automobile by Archie Roland Talley, specifically including personal injury and property damage sustained by Ronnie Wayne Lane [sic] and Jessie H. Pruitt.

8. Archie Roland Talley had initial permission from NCNB to operate the 1979 Chrysler automobile.

9. NCNB was insufficiently aggressive in seeking to recover the 1979 Chrysler automobile and allowed the vehicle to be registered with the North Carolina Department [sic] of

Motor Vehicles and display a current safety inspection sticker for year 1981.

10. NCNB's course of conduct constitutes mutual acquiescence or lack of objection signifying assent to the operation of the 1979 Chrysler automobile by Archie Roland Talley at the time of the accident on April 12, 1981.

11. NCNB's efforts were ineffective to revoke initial permission to Archie Roland Talley to operate the 1979 Chrysler automobile on April 12, 1981.

12. Archie Roland Talley had permission from NCNB to operate the 1979 Chrysler on April 12, 1981.

13. Alternatively, Nationwide provides voluntary coverage under policy 61-GA-640-273-0002 with NCNB for legal liability of Archie Roland Talley arising out of the operation of the 1979 Chrysler automobile on April 12, 1981, up to the limits of Nationwide's policy ($500,000 bodily injury/$250,000 property damage).

## II.

[1] At the time Talley and NCNB executed the lease and at the time of Talley's collision with the automobile occupied by defendants Land and Pruitt, the relevant portion of § 281 provided the following:

> [I]t shall be unlawful for any person, firm or corporation to engage in the business of renting or leasing motor vehicles to the public for operation by the rentee or lessee unless such person, firm or corporation has secured insurance for his own liability and that of his rentee or lessee . . . . Each such motor vehicle leased or rented must be covered by a policy of liability insurance insuring the owner and rentee or lessee and their agents and employees while in the performance of their duties against loss from any liability imposed by law for damages . . . .

Defendants contend that the insurance coverage mandated by § 281 cannot be terminated by a lessee's violation of the lease agreement, even if it results in the lessor's termination of the lease pursuant to its terms, but that the lessor-lessee relationship continues to exist and § 281 remains in effect until either the

lease expires by virtue of its own terms or the lessor regains possession of the leased automobile. This is so, contend defendants, because the language of § 281 is absolute, and because this Court in *American Tours, Inc. v. Liberty Mutual Ins. Co.*, 315 N.C. 341, 338 S.E. 2d 92 (1986) held that the liability carrier for a lessor is required to provide coverage as mandated by § 281 despite direct violation of the lease agreement by the lessee. In addition, defendants argue that this Court's acceptance of the proposition — that a lessee, while still in possession of the leased automobile, will cease to be a lessee if he violates some provision of the lease — would impose upon the courts "an unworkable quagmire of decisional problems in future cases." Finally, defendants contend that the purpose of § 281 is to place the risk of liability for damages caused by the operator of a leased automobile upon the lessor and the lessor's insurance carrier, not to place that risk upon innocent members of the public. We find no merit in these contentions on the facts of this case.

There is no doubt that § 281 prescribes mandatory terms which become a part of every liability insurance policy covering automobile lessors in this State. *American Tours, Inc. v. Liberty Mutual Ins. Co.*, 315 N.C. 341, 346, 338 S.E. 2d 92, 96; *Insurance Co. v. Broughton*, 283 N.C. 309, 315, 196 S.E. 2d 243, 247 (1973). Consequently, the Nationwide policy issued to NCNB must afford coverage for Talley's operation of the automobile at the time of the collision on 12 April 1981 if the relationship of lessor-lessee existed between NCNB and Talley at that time.

Defendants rely on the recent case of *American Tours, Inc. v. Liberty Mutual Ins. Co.*, 315 N.C. 341, 338 S.E. 2d 92, which involved a lessee father who permitted his nineteen-year-old daughter to drive his leased automobile in violation of a lease provision prohibiting the use of the automobile by anyone under the age of twenty-one. The daughter was involved in a collision while driving the automobile. In finding that the lessor's insurer provided coverage under § 281 in spite of the lessee's clear violation of the lease agreement, this Court stated, "The public policy expressed in § 281 is that even where automobile rental agreements are violated it is preferable to provide coverage for innocent motorists rather than to deny such coverage because of the violation." *American Tours*, 315 N.C. at 348, 338 S.E. 2d at 97.

We believe that the *American Tours* case is distinguishable from the case *sub judice*. In *American Tours*, the lessor-lessee relationship unquestionably existed between the leasing corporation and the father of the underaged driver at the time of the collision; the lessee's violation of a single provision of the lease did not effectively terminate that relationship. In the case *sub judice*, considerably more than an isolated violation of the lease agreement had occurred prior to the time of the collision on 12 April 1981. Talley had not made the monthly rental payments required under the lease since February 1980. As a result of the information received by NCNB through its investigation in March 1980, NCNB clearly considered itself insecure. The nonpayment of rent and the insecurity of the lessor constituted events of default under the terms of the lease, permitting NCNB to terminate the lease. On 2 April 1980, NCNB sent a letter to Talley, demanding payment or, in the alternative, surrender of the collateral, the 1979 Chrysler automobile. This notice was mailed to Talley at the address that Talley had listed on the lease as his address; Talley's brother was living at that address at that time. Upon receiving no response from this notice, NCNB sought to repossess the automobile by assigning the account to an automobile recovery service and by having a warrant issued for Talley's arrest. Talley further violated the terms of the lease by allowing the insurance issued by USF&G to lapse and by denying NCNB the right to inspect the automobile. The actions of NCNB clearly manifested its termination and rejection of the lease. NCNB's failure to actually locate and repossess the automobile does not in any way alter the fact that the lessor-lessee relationship between NCNB and Talley had been terminated. To hold otherwise on the facts of this case would render a lessor powerless to terminate a leasing arrangement where for all intents and purposes a defaulting lessee has converted and secreted a leased automobile.

Defendants contend that the lessor-lessee relationship between NCNB and Talley remained in effect on 12 April 1981 despite Talley's default and NCNB's efforts to repossess the automobile because the lease provided that in the event of its termination prior to the expiration of its term, the lessee would not be released from any of his obligations under the lease. We see no merit in this contention since this provision of the lease is nothing more than an acceleration or liquidated damages clause providing

for lessor's remedy in the event of a premature termination of the lease for any reason. It cannot be argued successfully that this language extends the lessor-lessee relationship beyond the termination of the lease.

We hold, therefore, that the facts herein stated do not support a conclusion that Talley was NCNB's lessee at the time of the collision on 12 April 1981. Since no lessor-lessee relationship existed at the time of the collision, the Nationwide policy insuring NCNB affords no coverage under § 281.

### III.

[2] In the alternative, defendants argue that the Nationwide policy, through its standard omnibus clause, provided coverage for Talley on 12 April 1981 because NCNB had not effectively withdrawn the permission it had originally granted to Talley for the use of the automobile and because NCNB acquiesced in and permitted Talley's continued use of the automobile after the violations of the lease occurred.

The Nationwide policy includes in its coverage, "The Named Insured" and "any other person while using an owned automobile or a hired automobile with the permission of the Named Insured, provided his actual operation . . . is within the scope of such permission . . . ." In order to determine whether such a clause, generally called an "omnibus clause," provides coverage for a specific accident, "[I]t is first necessary to decide whether the permission or consent of the named insured was granted to the person operating a motor vehicle at the time of the accident . . . and secondarily to determine whether the particular use made at the time was within the scope of the permission granted." 12 Couch on Insurance § 45:441 (1981). The permission that gives coverage under an omnibus clause may be express or implied. *Hawley v. Insurance Co.*, 257 N.C. 381, 384, 126 S.E. 2d 161, 164 (1962). This Court has explained the difference in the two kinds of permission in the following terms:

> Where express permission is relied upon it must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference. On the other hand, implied permission involves an inference arising from a course of conduct or relationship between the parties,

Nationwide Mutual Ins. Co. v. Land

in which there is mutual acquiescence or lack of objection under circumstances signifying assent.

*Hawley v. Insurance Co.*, 257 N.C. at 384, 126 S.E. 2d at 164-165. In the case *sub judice*, defendants argue and the trial court found that on 12 April 1981, Talley was operating the 1979 Chrysler automobile with both the express and the implied permission of NCNB.

NCNB clearly gave Talley express permission to operate the automobile on 7 December 1979. However, in *Hawley*, this Court stated that express permission may be limited, for "To hold that the scope of any permission cannot be limited would be strange 'in view of the fact . . . owner could sue . . . bailee for conversion of the automobile in exceeding his permission.' " *Hawley*, 257 N.C. at 387, 126 S.E. 2d at 167 (quoting 7 J. Appleman, *Insurance Law and Practice* § 4366 (1962) ). Moreover, "It is well established in this State that when the bailee deviates in a material respect from the grant of permission his use of the vehicle, while such deviation continues, is not a permitted use" within the meaning of an omnibus clause. *Wilson v. Indemnity Corp.*, 272 N.C. 183, 190, 158 S.E. 2d 1, 7 (1967). *See also Fehl v. Surety Co.*, 260 N.C. 440, 133 S.E. 2d 68 (1963).

The question of whether a deviation from express permission was minor or material has been addressed by this Court in several cases. In *Fehl v. Surety Co.*, 260 N.C. 440, 133 S.E. 2d 68, a prospective purchaser of an automobile obtained the permission of the salesman to drive the car seven miles down the road to the purchaser's home so that he could show the car to his wife; he promised the salesman he would return the car by 6:00 that evening. This Court found that the prospective purchaser's use of the automobile resulting in a collision the next day, seventy miles away, was outside the scope of the owner's permission under the omnibus clause of the owner's insurance policy because the facts showed a major deviation from the permitted use. Likewise, in *Wilson v. Indemnity Co.*, 272 N.C. 183, 158 S.E. 2d 1, this Court found that a bailee's use of the insured vehicle was outside the scope of the owner's permission where the owner gave bailee permission to drive the automobile down the road to a service station so long as the bailee returned the automobile within the hour, and the bailee was involved in a collision nearly twelve

hours later. Finally, in *Rhiner v. Insurance Co.*, 272 N.C. 737, 158 S.E. 2d 891 (1968), this Court found a material deviation from an express permitted use where the owner gave the bailee permission to drive the insured automobile ten blocks to pick up the bailee's clothing and to bring the automobile owner a bottle of liquor, and the bailee was involved in a car accident nearly two hours later, twenty miles away.

Although in the case *sub judice* it is unquestioned that NCNB, the insured owner, gave Talley its express permission to operate the automobile, this permission was not unlimited, but was subject to the terms and conditions of the lease agreement signed by Talley when he received possession of the automobile. Among the specific terms of the lease were the requirements that the lessee pay monthly rental fees, that the lessee maintain insurance on the leased vehicle, that the lessee not use the vehicle while under the influence of alcohol, and that the lessee advise NCNB of the location of the vehicle upon request by NCNB. In his operation of the automobile on 12 April 1981, Talley was in violation of all of the aforementioned terms and conditions of the lease. Therefore, we find that Talley's use of the automobile at the time of the collision was outside the scope of the express permission given by NCNB because it materially deviated from the express terms and conditions of the lease agreement.

Defendants also contend that NCNB's "insufficiently aggressive" efforts to recover the automobile after Talley's default and the fact that Talley had in his possession a valid registration card for the automobile, listing NCNB as the owner, create the inference that NCNB "acquiesced in" or impliedly permitted Talley's continued use of the automobile.

In showing an owner's implied permission to bring a use of the insured automobile under the coverage of an omnibus clause, "[T]he relationship between the owner and the user, such as kinship, social ties, and the purpose of the use, all have bearing on the critical question of the owner's implied permission for the actual use." *Bailey v. Insurance Co.*, 265 N.C. 675, 678, 144 S.E. 2d 898, 900 (1965). In the case *sub judice*, the relationship between the parties was governed by a lease, which is a contract that sets out the rights and duties of the parties to the relationship. A contention that an automobile use is impliedly permitted is strongly

negated by evidence showing that the use of the automobile is by virtue of a restricted express permission. *Rhiner v. Insurance Co.*, 272 N.C. 737, 739, 158 S.E. 2d 891, 893.

Although "It may be found that the insured has given implied permission where the named insured has knowledge of a violation of instructions and fails to make a significant protest," 6C J. Appleman, *Insurance Law and Practice* § 4365 (1979), such is not the case here. As recited above, when NCNB became aware of Talley's violations of the lease, it made efforts to contact him at his place of employment and at his home as designated in the lease agreement, sent a letter giving notice of default to the address designated in the lease, hired an automobile recovery bureau to repossess the car, and caused a warrant for Talley's arrest to be issued. These actions by NCNB constitute at the very least a "significant protest," and served to revoke the initial permission granted Talley to use the automobile. Likewise, implied permission cannot be inferred from the fact that at the time of the accident Talley had in his possession a valid registration card for the automobile. As the Court of Appeals pointed out, absent any findings as to how Talley obtained possession of the registration or that NCNB provided it to Talley, the mere fact that Talley possessed the registration card does not support a conclusion that NCNB acquiesced in Talley's use of the automobile.

For the reasons herein stated, we are of the opinion that the conclusions reached by the trial court that Talley had express or implied permission of NCNB to operate the automobile on 12 April 1981 are not sufficiently supported by that court's findings. Consequently, Nationwide's policy did not afford coverage for Talley's use of the automobile under the terms of the policy.

Therefore, it is the decision of this Court that the Nationwide insurance policy affords no coverage, compulsory or voluntary, for Talley's operation of the automobile on 12 April 1981. The decision of the Court of Appeals is therefore

Affirmed.

Justice MITCHELL dissenting.

For reasons well stated in Part III of the opinion of the majority, I agree that Talley had deviated materially from the per-

mission given him to use the vehicle in question, and that the standard omnibus clause of the Nationwide policy did not provide coverage for his use. I must respectfully dissent, however, from Part II of the majority opinion and from the result reached by the majority.

N.C.G.S. § 20-281 unambiguously provides in pertinent part that every "motor vehicle leased or rented must be covered by a policy of liability insurance insuring the owner and rentee or lessee . . . from any liability imposed by law for damages . . . caused by accident arising out of the operation of such motor vehicle . . . ." The clear legislative intent was to prevent any gap in North Carolina's compulsory liability insurance program by requiring that the lessor maintain liability insurance on all rented or leased vehicles so as to provide coverage for all rentees and lessees who might not have other insurance. As this Court pointed out in *American Tours, Inc. v. Liberty Mutual Ins. Co.*, 315 N.C. 341, 338 S.E. 2d 92 (1986), N.C.G.S. §§ 20-281 and 20-279.21 are parts of a legislative package designed to protect innocent citizens from financially irresponsible motorists. We clearly indicated in *American Tours* that the liability insurance carrier for the lessor may not escape its duty to provide coverage under any policy required by N.C.G.S. § 20-281 by showing that the use of the motor vehicle by the lessee was in direct violation of the terms of the lease. This being the established law, I believe that such insurance coverage must be held to remain in force and effect until the expiration of the term of the lease or an earlier express termination of the lease.

The evidence before the trial court in the present case tended to show that, on 2 April 1980, North Carolina National Bank sent a letter to Talley at his address as shown in the lease agreement. That letter informed Talley that he was in default under the lease agreement. It then continued by stating:

Accordingly, notice is herewith given that North Carolina National Bank makes demand that:

You pay the entire unpaid "net balance" of $6,570.40.

If the above demand is not met within five (5) days from this date, you are further advised to surrender to North Carolina

National Bank any collateral which secured the account above identified.

Your failure to comply with this demand within the five days will necessitate our taking legal action which will result in additional expense to you.

This letter of 2 April 1980 to the defendant was stipulated in evidence.

For me, the question which must be answered prior to a proper resolution of this case is whether the quoted letter of 2 April 1980 from North Carolina National Bank to Talley was an effective termination of the lease prior to the expiration of its term. Certainly, the terms of the lease itself gave North Carolina National Bank the authority to terminate it by reason of the default by Talley. Although not entirely free from ambiguity, the letter of 2 April 1980, when read in context with the other evidence in this case, would have supported a determination by the trial court that North Carolina National Bank had given Talley specific notice of termination of the lease and, therefore, had effectively terminated the lease prior to the expiration of its term. However, the trial court did not specifically focus on this question and made no such determination. Therefore, I would reverse the decision of the Court of Appeals and remand this case to that court for its further remand to the Superior Court, Rockingham County, for appropriate findings and conclusions and the entry of judgment thereon.

Justice FRYE joins in this dissenting opinion.