JOSHUA WATSON BISSETTE, Plaintiff v. AUTO-OWNERS INSURANCE COMPANY
AND BRYAN KEITH COTHRAN, Defendants

No. COA09-1721

(Filed 7 December 2010)

## 1. Insurance— duty to defend, indemnify, or cover—summary judgment proper

The trial court did not err in granting summary judgment in favor of plaintiff because there were no genuine issues of material fact as to whether defendant Auto-Owners Insurance Company had a duty under the insurance policy at issue to defend, indemnify, or cover defendant Cothran for the claims or judgments arising from plaintiff's lawsuit.

## 2. Insurance— failure to cooperate—coverage not voided

Defendant Cothran's failure to cooperate in his defense in an action resulting from an automobile accident did not void any coverage that defendant Auto-Owners Insurance Company was required to provide Cothran under the insurance policy at issue. Auto-Owners failed to show that Cothran's non-compliance was prejudicial.

Appeal by Defendant Auto-Owners Insurance Company from order entered 16 September 2009 by Judge Milton F. Fitch, Jr. in Wilson County Superior Court. Heard in the Court of Appeals 12 May 2010.

*Taylor Law Office, by W. Earl Taylor, Jr., for Plaintiff.*

*Brown, Crump, Vanore & Tierney, L.L.P., by O. Craig Tierney, Jr., for Defendant Auto-Owners Insurance Company.*

*No Brief for Defendant Bryan Keith Cothran.*

STEPHENS, Judge.

At issue is whether the trial court erred in granting summary judgment in favor of Plaintiff because there were genuine issues of material fact regarding (1) Defendant Auto-Owners Insurance Company's ("Auto-Owners") duty to defend, indemnify, or cover Bryan Keith Cothran ("Cothran"),[1] and (2) the impact on Auto-Owners' duty to defend, indemnify, or cover Cothran in light of Cothran's failure to cooperate in his defense. For the reasons stated herein, we affirm the judgment of the trial court.

---

1. Cothran is not a party to this appeal.

*I. Procedural History and Evidence* ·

Craig A. Cleveland ("Cleveland"), owner and President of Connected Fiber, Inc. ("Connected"), allegedly sold a 1997 Ford F-150 ("vehicle") to Cothran on 11 August 2007 in North Myrtle Beach, South Carolina. Cleveland sold the vehicle to Cothran on behalf of Connected. At the time of the sale, the vehicle was registered and titled in North Carolina.

·When the vehicle was transferred to Cothran, the signed Certificate of Title was not notarized, nor were the North Carolina license plates removed. Cleveland gave Cothran the un-notarized, signed Certificate of Title, the keys to the vehicle, and possession of the vehicle. Cothran, a South Carolina resident, never registered the vehicle in South Carolina or obtained South Carolina license places for the vehicle. The vehicle remained titled in Connected's name in North Carolina.

On 14 October 2007, Cleveland sent an email to General Insurance Services, Connected's insurance agent, informing it that the vehicle had been sold and requesting that the vehicle be removed from Connected's insurance policy with Auto-Owners ("Policy") "at renewal." Renewal was to occur on 25 November 2007. Alicia Cathey of General Insurance Services received the email. Ms. Cathey notified Auto-Owners that the vehicle was to be removed from the Policy effective 25 November 2007.

On 16 November 2007, Cothran was driving the vehicle in Wilson County, North Carolina when he collided with a vehicle being driven by Plaintiff Joshua Watson Bissette ("Bissette"). Bissette sustained serious personal injuries. On 21 November 2007, General Insurance Services recorded a loss notice regarding the accident for the claim filed by Bissette. At that time, the vehicle was listed as an "insured vehicle" on the Policy, and Connected was listed as the vehicle's owner.

Bissette brought a negligence action against Cothran to recover for injuries he sustained in the accident. On 27 December 2007, Auto-Owners assigned attorney Ronald G. Baker ("Baker") to represent Cothran in that action.[2] Baker spoke with Cothran on the telephone on 29 January 2008. During that call, Baker informed Cothran of the lawsuit against him and stressed the importance of his cooperation, but did not discuss any specific details of the case with Cothran.

2. Auto-Owners' retention of Baker was under a reservation of its right to contest its duty to defend Cothran.

Although Baker attempted to contact Cothran on numerous occasions thereafter, he was never able to speak with Cothran again, and Cothran did not appear at trial.

Due to his continued inability to contact Cothran, Baker filed a Motion to Intervene on behalf of Auto-Owners on 25 May 2008. The motion was granted on 25 August 2008. Baker thus defended Bissette's negligence suit in the name of Auto-Owners. Bissette prevailed in the negligence action on 27 October 2008, and was awarded $375,000 in compensatory damages and $80,000 in punitive damages.

Bissette initiated this declaratory judgment action against Auto-Owners on 28 October 2008 after Auto-Owners failed to pay the judgment, failed to acknowledge insurance coverage, and raised issues questioning the existence of coverage for the damages awarded Bissette. On 27 August 2009, Bissette filed a Motion for Summary Judgment. Following a hearing, Judge Fitch, Jr. granted Bissette's motion. From the order granting summary judgment, Auto-Owners appeals.

## II. Discussion

### A. Duty to Defend, Indemnify, or Cover

[1] Auto-Owners first contends that the trial court erred in granting summary judgment in favor of Bissette because there were genuine issues of material fact as to whether Auto-Owners had a duty under the Policy to defend, indemnify, or cover Cothran for the claims or judgments arising from Bissette's lawsuit. For the reasons stated herein, we conclude that the trial court properly granted summary judgment in favor of Bissette on this issue.

### 1. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2009). Furthermore, when considering a summary judgment motion, "all inferences of fact . . . must be drawn against the movant and in favor of the party opposing the motion." *Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975) (citation and quotation marks omitted). We review a trial court's order granting or denying summary judgment *de novo*. *Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637

S.E.2d 528, 530 (2006). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment" for that of the lower tribunal. *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003).

### 2. Insurance Policy Coverage for the Vehicle

Where the language of an insurance policy is clear and unambiguous, the contract must be enforced "as the parties have made it." *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970). Thus, a court is authorized to construe an insurance policy only when ambiguity exists in a policy provision. *Id.* In order for an ambiguity to exist, the language of an insurance policy provision must be "fairly and reasonably susceptible to either of the constructions for which the parties contend." *Id.* Our Supreme Court recently restated its longstanding view of insurance policy construction in *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 692 S.E.2d 605 (2010), when it stated that "[t]his Court resolves any ambiguity in the words of an insurance policy against the insurance company." *Id.* at 9, 692 S.E.2d at 612. Further, "this Court 'construe[s] liberally' insurance policy provisions that extend coverage 'so as to provide coverage[] whenever possible by reasonable construction[.]' " *Id.* at 9-10, 692 S.E.2d at 612 (quoting *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986)).

Auto-Owners specifically argues that at the time of the accident, the vehicle was not owned by Connected, and because Connected's policy with Auto-Owners provides liability coverage only for vehicles owned by Connected, no coverage is afforded to Cothran for the accident. We disagree.

The relevant portions of the Policy are as follows:

**ITEM ONE**

INSURED CONNECTED FIBER INC CRAIG CLEVELAND

. . . .

POLICY TERM
12:01 a.m. 11-25-2006 to 12:01 a.m. 11-25-2007

. . . .

**BISSETTE v. AUTO-OWNERS INS. CO.**

[208 N.C. App. 321 (2010)]

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUB-
JECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH
YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM TWO—SCHEDULE OF COVERED AUTOS AND
COVERAGES**

This policy provides only those coverages where a charge is
shown in the premium column below. Each of these coverages
will apply only to those "autos" shown as covered "autos[.]"
"AUTOS" are shown as covered "autos" for a particular coverage
by the entry of one or more symbols from the COVERED AUTO
section of the Business Auto Coverage Form next to the name of
the coverage.

COVERAGES . . . . Combined Liability
COVERED AUTOS SYMBOLS . . . . 7

LIMIT OF LIABILITY[3] . . . . $1Million ea acc[ident]

. . . .

**ITEM THREE**—Schedule of Covered Autos You Own, Additional
Coverages and Endorsements. . . .

DESCRIPTION OF ITEM INSURED . . . .

4. 1997 FORD F-150 . . . .

COVERAGES . . . . Combined Liability
LIMITS . . . . $1Million each acc[ident]

. . . .

**BUSINESS AUTO COVERAGE FORM**

. . . .

SECTION I - COVERED AUTOS

. . . .

**A.  DESCRIPTION OF COVERED AUTO DESIGNATION
SYMBOLS**

SYMBOL DESCRIPTION

. . . .

2 = OWNED "AUTOS" ONLY. Only those"autos" you own . . . .

3. FOR ANY ONE ACCIDENT OR LOSS

. . . .

7 = SPECIFICALLY DESCRIBED "AUTOS." Only those "autos" described in ITEM THREE of the Declarations for which a premium charge is shown . . . .

Under ITEM ONE of the Policy, coverage applied until the end of the Policy term at 12:01 a.m. on 25 November 2007. Auto-Owners acknowledged that on 14 October 2007, Cleveland sent an email to General Insurance Services, Inc. stating that he had sold the vehicle and that he desired to remove the vehicle from the Policy "at renewal." It is undisputed that the date of renewal was 25 November 2007, nine days after the 16 November 2007 accident. Thus, the vehicle was still covered by the Policy when the accident occurred.

Under "ITEM TWO—SCHEDULE OF COVERED AUTOS AND COVERAGES[,]" coverage applies to those autos shown as "covered 'autos[.]' " Autos are designated as "covered" by the entry of one or more symbols from the "COVERED AUTOS" section of the Business Auto Coverage Form. Coverage under Connected's Policy is described as "Combined Liability" coverage, and this "Combined Liability" coverage covers those autos that meet the coverage requirements of Symbol "7[.]"

The USINESS AUTO COVERAGE FORM, which defines symbol meanings, defines Symbol "7" as "SPECIFICALLY DESCRIBED 'AUTOS' . . . [o]nly those 'autos' described in ITEM THREE of the Declarations for which a premium charge is shown[.]" ITEM THREE of the policy specifically lists the 1997 Ford F-150 vehicle at issue and shows a premium charge for the vehicle. Thus, pursuant to these provisions of the Policy, liability coverage is afforded to the vehicle.

Auto-Owners contends that because the caption of ITEM THREE states, "ITEM THREE—Schedule of Covered Autos You *Own*, Additional Coverages and Endorsements[,]" (emphasis added), liability coverage is afforded only to those motor vehicles *owned* by Connected. Auto-Owners' argument is unavailing. The BUSINESS AUTO COVERAGE FORM designates a Symbol "2" for "OWNED 'AUTOS' ONLY." The Policy terms are clear that when liability coverage is intended to apply only to those motor vehicles owned by Connected, a Symbol "2" is inserted in ITEM TWO of the Declarations page instead of a Symbol "7[,]" which applies to those autos listed in ITEM THREE including the Ford F-150. Furthermore, the Policy description of Symbol "7" does not limit "SPECIFICALLY DESCRIBED AUTOS" to vehicles owned by the named insured.

**BISSETTE v. AUTO-OWNERS INS. CO.**

[208 N.C. App. 321 (2010)]

Accordingly, resolving any ambiguity in the words of the Policy against Auto-Owners and construing the Policy's provisions liberally to provide coverage when possible by reasonable construction, *Harleysville Mutual Ins. Co.*, 364 N.C. at 9-10, 692 S.E.2d at 612, we conclude that the vehicle was covered under the Policy on the date of the accident.

### 3. *Qualification as an "Insured" Under the Policy*

Auto-Owners further argues that at the time of the accident, Cothran was not an "Insured" under the Policy, as he is not a named insured and does not qualify under the Policy provision providing coverage to "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow" subject to exceptions. We disagree.

The relevant portions of the Policy are as follows:

### SECTION II—LIABILITY COVERAGE

### A. COVERAGE

> We will pay all sums an "Insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto[.]"
>
> . . . .
>
> We have the right and duty to defend any "suit" asking for such damages or a "covered pollution cost or expense." However, we have no duty to defend "suits" for "bodily injury" or "property damage" or a "covered pollution cost or expense" not covered by this Coverage Form. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

### 1. WHO IS AN INSURED

> The following are "Insureds:"
>
> a. You for any covered "auto."
>
> b. Anyone else while using with your permission a covered "auto" you own, hire or borrow
>
> . . . .

As Auto-Owners notes, Section II(A)(1)(b) of the Policy states that "[a]nyone else while using with your permission a covered 'auto' you own, hire or borrow" is covered, subject to exceptions inapplicable to this case. Thus, as Cothran is not a named insured, in order to be covered under the Policy (1) he must have permission from Connected to operate the vehicle and (2) the vehicle must be owned, hired, or borrowed by Connected. Neither the hiring nor the borrowing of the vehicle is at issue here; thus, Connected must own the vehicle in order for Cothran to be covered and for Auto-Owners to be liable for that coverage.

### i. Permission to Operate Vehicle

"Permission to use an automobile may be express, or may be implied from a course of conduct between the parties." *Nationwide Mut. Ins. Co. v. Land*, 78 N.C. App. 342, 349, 337 S.E.2d 180, 185 (1985), *aff'd*, 318 N.C. 551, 350 S.E.2d 500 (1986). In this case, it is undisputed that Cleveland gave Cothran the signed Certificate of Title, the keys to operate the vehicle, and possession of the vehicle. These actions clearly evidence Cleveland's intent, on behalf of Connected, to permit Cothran to operate the vehicle, and Auto-Owners has presented no evidence to the contrary.

### ii. Ownership of the Vehicle

Under North Carolina law, an "owner" of a vehicle is "[a] person holding the legal title to a vehicle[.]" N.C. Gen. Stat. § 20-4.01(26) (2007). Pursuant to N.C. Gen. Stat. § 20-72(b),

> [i]n order to assign or transfer title or interest in any motor vehicle registered under the provisions of this Article, the owner shall execute in the presence of a person authorized to administer oaths an assignment and warranty of title on the reverse of the certificate of title in form approved by the Division, including in such assignment the name and address of the transferee; and no title to any motor vehicle shall pass or vest until such assignment is executed and the motor vehicle delivered to the transferee.

N.C. Gen. Stat. § 20-72(b) (2007). Applying the statutory definition of "owner," the statutory requirements for passing title, and the statutory requirements for liability insurance, we have held that for purposes of tort law and liability insurance coverage, no ownership passes to the purchaser of a motor vehicle which requires registration until:

(1) the owner executes, in the presence of a person authorized to administer oaths, an assignment and warranty of title on the reverse of the certificate of title, including the name and address of the transferee; (2) there is an actual or constructive delivery of the motor vehicle; and (3) the duly assigned certificate of title is delivered to the transferee (or lienholder in secured transactions).

*Jenkins v. Aetna Cas. and Sur. Co.*, 324 N.C. 394, 398, 378 S.E.2d 773, 776 (1989). Moreover, "[w]henever the owner of a registered vehicle transfers or assigns his title or interests thereto, he shall remove the license plates. The registration card and plates shall be forwarded to the Division unless the plates are to be transferred to another vehicle . . . ." N.C. Gen. Stat. § 20-72(a) (2007). Compliance with the statutory requirements for proper transfer of ownership are "mandatory" and "not within the discretion" of the parties involved in the transaction. *Thompson Cadillac-Oldsmobile, Inc. v. Silk Hope Auto., Inc.*, 87 N.C. App. 467, 473, 361 S.E.2d 418, 422 (1987), *disc. rev. denied*, 321 N.C. 480, 364 S.E.2d 672 (1988).

In this case, although the vehicle was actually delivered to Cothran and the certificate of title was given to Cothran at the time he took possession of the vehicle, Cleveland failed to "execute[], in the presence of a person authorized to administer oaths, an assignment and warranty of title on the reverse of the certificate of title, including the name and address of the transferee" on behalf of Connected. *Jenkins*, 324 N.C. at 398, 378 S.E.2d at 776. Thus, the certificate of title delivered to Cothran was insufficient to transfer ownership of the vehicle from Connected to Cothran. Accordingly, Connected remained the "owner" of the vehicle on the date of the accident.[4]

Auto-Owners argues, however, that under the "law of the case" doctrine, South Carolina law, not North Carolina law, governs the outcome. Auto-Owners further argues that under South Carolina law, Cothran was the owner of the vehicle. We disagree with both contentions.

"Pursuant to the law of the case doctrine, an appellate court ruling on a question governs the resolution of that question both in subsequent proceedings in the trial court and on a subsequent appeal, provided the same facts and the same questions, which were determined in the previous appeal, are involved in the second appeal." *Kanipe v. Lane Upholstery, Hickory Tavern Furniture Co.*, 151 N.C.

---

4. We also note that at the time of the accident, the vehicle still bore the North Carolina license plates.

App. 478, 484-85, 566 S.E.2d 167, 171 (citation and quotation marks omitted), *disc. review denied and disc. review dismissed*, 356 N.C. 303, 570 S.E.2d 724, *petition for reconsideration dismissed*, 356 N.C. 437, 572 S.E.2d 784 (2002). The doctrine "only applies to points actually presented and necessary for the determination of the case and not to dicta." *Id.* at 485, 566 S.E.2d at 171.

In the underlying tort action between Bissette and Cothran, the trial court instructed the jury on South Carolina law as to the issue of ownership of the vehicle. Because the *trial* court's ruling on which state law applies does not govern the resolution of that issue on a subsequent appeal,[5] and because the underlying tort action was not appealed such that this Court ruled on the issue, Auto-Owner's reliance on the "law of the case" doctrine is misplaced.

Nonetheless, even if South Carolina law is applied to determine ownership of the vehicle, we conclude that Connected was the owner of the vehicle at the time of the accident.

The South Motor Vehicle Financial Responsibility Act describes an "owner" as "[a] person who holds the legal title of a motor vehicle[.]" S.C. Code Ann. § 56-9-20(9) (2007). Pursuant to S.C. Code Ann. § 56-19-360,

[i]f an owner, manufacturer or dealer transfers his interest in a vehicle other than by the creation of a security interest, he shall, at the time of the delivery of the vehicle, execute an assignment and warranty of title to transferee in the space provided therefor on the certificate or as the Department of Motor Vehicles prescribes and cause the certificate and assignment to be mailed or delivered to the transferee or to the Department.

Except as provided in § 56-19-370, the transferee shall, promptly after delivery to him of the vehicle, execute the application for a new certificate of title in the space provided therefor on the certificate or as the Department prescribes and cause the certificate and application to be mailed or delivered to the Department.

Except as provided in § 56-19-370, and as between the parties, a transfer by an owner is not effective until the provisions of this section have been complied with.

---

5. This assumes, *arguendo*, that the trial court's jury instruction constitutes a "ruling" that South Carolina law applies to the transfer of the vehicle.

S.C. Code Ann. § 56-19-360 (2007). However, unlike in North Carolina where strict compliance with statutory requirements is required to effect a transfer of ownership of a vehicle, a transferee may become the owner of a vehicle in South Carolina notwithstanding a lack of compliance with this statute as the issue of ownership of a vehicle in South Carolina is a question of fact for purposes of coverage under insurance policies. *South Carolina Farm Bureau v. Scott*, 262 S.E.2d 739 (S.C. 1980). The determination depends on the specific facts and circumstances of the case in question. *Id.* A certificate of title is *prima facie* evidence of ownership. S.C. Code Ann. § 56-19-320 (2007). The presumption of ownership evidenced by the certificate of title may, however, be overcome by evidence that the true owner of the vehicle is a person other than the one in whose name the vehicle is registered. *Bankers Ins. Co. of Pa. v. Griffin*, 137 S.E.2d 785, 787 (S.C. 1964).

In *Travelers Ins. Co. v. Lawson*, 281 S.E.2d 116 (S.C. 1981), a declaratory judgment action was brought by The Travelers Insurance Company ("Travelers") to determine whether it or defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") was the insurer for a Pontiac automobile involved in an accident. The facts in that case were as follows:

Lift Truck Services of Charlotte, Inc. (Lift Truck) owned the Pontiac and had a North Carolina Highway Department Certificate of Title. It was insured by Penn National. Lift Truck sold the Pontiac to Benjamin Bolt and delivered it to Bolt's residence in Myrtle Beach, S.C. The Pontiac was added to Bolt's insurance coverage with Travelers but no formal transfer of title from Lift Truck to Bolt was effected. During the dates of Travelers' policy coverage and prior to transfer of title from Lift Truck to Bolt, the Pontiac collided with Thelma Lawson. She sued Bolt and settled the case for $ 5,500.00. Travelers and Penn National had an understanding that this declaratory judgment action would be instituted for the purpose of determining which of the two companies would bear the brunt of the $ 5,500.00 settlement.

*Id.* at 117.

Based upon these facts, the Court concluded that

[t]here can be no doubt but that it was the intent of both the seller and the buyer that title pass and that the buyer have all rights

incident to property ownership. There can also be no doubt but that it was the intent of Travelers to protect the buyer against liability and, accordingly, a premium was charged and collected.

*Id.* at 118. Thus, the Court concluded that Travelers must assume full responsibility for paying the settlement. *Id.* The Court emphasized, however, that:

[t]he registration statutes and the title and transfer statutes have as one of their purposes to assure insurance coverage at all times so as to protect the public. In holding that Travelers is responsible, we do not necessarily imply that Penn National and/or the seller would not under any circumstances be liable in a different factual situation. For example, *if the buyer had not procured insurance coverage, a different issue would be presented.*

*Id.* (emphasis added).

South Carolina appellate courts have deemed someone other than the actual titleholder to be the owner of a vehicle under other similar circumstances. *See, e.g., Tollison v. Reaves,* 289 S.E.2d 163 (S.C. 1982) (finding person "true owner" of automobile titled to his mother, because person considered himself the owner, made the down payment and all other payments on the automobile, held his own insurance on the automobile, and had sole possession); *Grain Dealers Mut. Ins. Co. v. Julian,* 145 S.E.2d 685 (S.C. 1965) (holding a person not holding title was true owner where person had purchased and paid for automobile and possessed a bill of sale); *State Auto Ins. Co. v. Stuart,* 337 S.E.2d 698 (S.C. App. 1985) (person not holding title found to be owner of car where titleholder had loaned that person money to purchase car, had issued bill of sale, and had transferred possession).

The facts in this case are readily distinguishable from the cases cited above. Here, at the time of the accident, the certificate of title to the vehicle was issued by the North Carolina Division of Motor Vehicles in the name of Connected. Although Cleveland signed the back of the certificate of title when he gave it to Cothran, no certificate of title was issued to Cothran by the State of South Carolina. Accordingly, there was a presumption of Connected's ownership of the vehicle, as evidenced by the certificate of title issued in its name.

Additionally, the vehicle was registered with the North Carolina Division of Motor Vehicles in Connected's name, and the State of South Carolina never issued a South Carolina registration for the vehicle to Cothran. Furthermore, the license plates on the vehicle

BISSETTE v. AUTO-OWNERS INS. CO.

[208 N.C. App. 321 (2010)]

were the North Carolina license plates which had been issued to Connected, and no license plates were ever issued in South Carolina to Cothran. In fact, the South Carolina Department of Motor Vehicles found no record for the vehicle at all. Moreover, unlike in *Travelers Ins. Co.* and *Tollison*, Cothran never obtained insurance on the vehicle while Connected's policy for the vehicle remained in effect on the date of the accident. Finally, although Cleveland gave Cothran the North Carolina certificate of title, the vehicle, and the keys, unlike in *Grain Dealers Mut. Ins. Co.* and *State Auto Ins. Co.*, no bill of sale was ever issued by Connected to Cothran.

While the facts indicate that Cothran had Connected's *permission* to use the vehicle, such facts are insufficient to show that title to the vehicle had passed and that Cothran had all rights incident to property ownership on the date of the accident. Moreover, there can be no doubt that it was the intent of Auto-Owners to protect Connected against liability until 25 November 2007 and, thus, a premium was charged and collected. Accordingly, as Auto-Owners failed to rebut the presumption of Connected's ownership of the vehicle, the trial court did not err in granting summary judgment in favor of Bissette on this issue.

### B. Cothran's Non-Compliance

[2] Auto-Owners next argues that Cothran's failure to cooperate in his defense voided any coverage that Auto-Owners would have been required to provide Cothran under the Policy.

Section IV(A) of the Policy provides in pertinent part:

2. **DUTIES IN THE EVENT OF ACCIDENT, CLAIM, OR LOSS**

    a. In the event of "accident," claim, "suit" or "loss," you must give us or our authorized representative prompt notice of the "accident" or "loss." . . . .

    . . . .

    b. Additionally, you and any other involved "insured" must:

    . . . .

    (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit."

In *Henderson v. Rochester Am. Ins. Co.*, 254 N.C. 329, 118 S.E.2d 885 (1961), our Supreme Court explained that the provisions of liability insurance policies imposing as conditions to liability the duty of the insured to give notice of accidents and to cooperate in the defense of actions which might result in a judgment against the insured

> are to be given a reasonable interpretation to accomplish the purpose intended, that is, to put [the] insurer on notice and afford it an opportunity to make such investigation as it may deem necessary to properly defend or settle claims which may be asserted, and to cooperate fairly and honestly with [the] insurer in the defense of any action which may be brought against [the] insured, and upon compliance with these provisions to protect and indemnify within the policy limits the insured from the result of his negligent acts. An insurer will not be relieved of its obligation because of an immaterial or mere technical failure to comply with the policy provisions. *The failure must be material and prejudicial.*

*Id.* at 332, 118 S.E.2d at 887 (emphasis added). The burden of proving material prejudice lies with the insurer. *See Lockwood v. Porter*, 98 N.C. App. 410, 411, 390 S.E.2d 742, 743 (1990) ("[F]ailure to cooperate under an insurance policy is an affirmative defense upon which [the insurer] has the burden of proof.").

In this case, Cothran did not notify Auto-Owners that the accident had occurred or that a lawsuit had been filed against him, did not contact Baker or provide Baker with any information regarding the accident, and did not appear at trial. Auto-Owners argues that this lack of cooperation materially prejudiced Auto-Owners and relieved it of its duty to indemnify Cothran.[6] We disagree.

Although Cothran did not notify Auto-Owners of the claim, Auto-Owners received timely notice of the law suit and assigned attorney Baker to the case on 27 December 2007. Baker, an attorney in Ahoskie, North Carolina who has been engaged in civil litigation for 34 years, represented Cothran and eventually Auto-Owners in the underlying lawsuit. At deposition, Baker testified that early in his defense of the case, he talked with Cothran on one occasion. During that conversation, he did not inquire into any details of the accident. After that conversation, Baker was not able to reach Cothran again, and Cothran did not appear at trial.

---

6. Auto-Owners makes no claim that Connected failed in any way to cooperate with Auto-Owners in the investigation, settlement, or defense of the claim against Cothran.

Baker testified that there was "never any question in [my] mind" concerning Cothran's negligence and that based on the evidence that was available to Baker, he did not believe that liability could be contested. He thus stipulated at trial that Cothran's negligence was a proximate cause of the accident. Baker further testified that Bissette introduced a videotape of the collision at trial and presented evidence that Cothran had a blood alcohol level of .21. Baker also testified that he had all of Bissette's medical records and was able to fully explore the damages issue presented by Bissette's claim. Baker took no discovery depositions because there was "nothing to be gained" by doing so. Finally, Baker maintained that admitting negligence was the "right decision," and that in terms of the admission of Cothran's liability, there is "nothing [he] would have done different[ly]."

Auto-Owners nonetheless argues that, according to Baker, the prejudice to Auto-Owners included, but was not limited to:

1. Auto-Owners having to appear in its own name—thus allowing knowledge of liability insurance to be before the jury;

2. Auto-Owners tried the case with an "empty chair" and the jury had no opportunity to see and evaluate Mr. Cothran;

3. The jury was left with an impression that Cothran "doesn't really care;"

4. Mr. Cothran could not tell the jury why he was drinking or how much he drank;

5. Mr. Baker never got the benefit of discussing the facts of the accident with Mr. Cothran;

6. Mr. Cothran was not present to express contrition for his acts;

7. Mr. Cothran's absence has a significant impact on the outcome of the case, including but not limited to the damage award.

We first note that, contrary to Auto-Owners' seventh contention above, Baker did not testify that Cothran's absence had a "significant impact on the outcome of the case," but rather that his absence had a "significant *potential* for having an adverse impact on the outcome of the case." (Emphasis added). Moreover, Auto-Owners' examples of alleged prejudice, which assume that Cothran's presence would have been beneficial to his defense, reflect mere speculation concerning potential prejudice. Auto- Owners has failed to show that Cothran's

absence could have been prejudicial when Cothran's liability was so clear that Baker stipulated to it. In light of this stipulation, the only issue that remained for the jury to consider was damages. Baker acknowledged that he had in his possession all of Bissette's medical records such that he could fully defend the case on damages. Additionally, Baker testified at deposition that he did not consider the damages ultimately awarded by the jury to be excessive, and, thus, he did not move to set aside the jury's verdict on damages.

Based on our review of the record, we conclude that Auto-Owners has failed to carry its burden of proving material prejudice based on Cothran's failure to cooperate in his defense. Accordingly, the trial court did not err in granting summary judgment for Bissette on this issue.

The judgment of the trial court is affirmed.

AFFIRMED.

Judges HUNTER and GEER concur.